# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CAROLE FAYE GWIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 15 C 6107 |
| | ) |
| CAROLYN W. COLVIN, Commissioner of | ) Judge Rebecca R. Pallmeyer |
| Social Security | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carole Gwin brings this action against the Acting Commissioner of Social Security, Nancy Berryhill,[1] pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking review of the Commissioner's determination that Plaintiff received an overpayment of disability insurance benefits. Plaintiff received disability benefits from August 2009 until March 2012. In June 2012, however, the Social Security Administration ("SSA") determined that she had not been eligible for benefits during that period because she had been engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1571 ("If you are able to engage in substantial gainful activity, we will find that you are not disabled."). The SSA also sought repayment of the $54,053.60 it had provided her during that period. Plaintiff's request for reconsideration of the SSA's overpayment determination was denied, and following a hearing, an administrative law judge (ALJ) issued a written decision affirming that Plaintiff had been performing substantial gainful activity while receiving disability benefits and was therefore liable for repayment of the $54,035.60 she had received. In addition to her request for reconsideration, Plaintiff requested a waiver of overpayment recovery, but the ALJ did not address that request in her decision. After the SSA Appeals Council denied Plaintiff's request for review of the ALJ's decision, Plaintiff brought this suit.

---

[1] Carolyn Colvin was the Acting Commissioner of Social Security at the time Plaintiff filed this suit. Berryhill became the Acting Commissioner in January 2017.

Plaintiff asks this court to remand her case for further administrative proceedings, and she has moved for summary judgment [19] on that request. She contends that remand is required because the ALJ (1) lacked substantial evidence to support the conclusion that Plaintiff engaged in substantial gainful activity, (2) failed to make an express assessment of Plaintiff's credibility, and (3) ignored Plaintiff's request for waiver of overpayment. The Commissioner responds that substantial evidence in the record supports the ALJ's conclusion and that the ALJ appropriately considered Plaintiff's credibility. With respect to waiver of overpayment, the Commissioner contends that the court lacks jurisdiction to consider that question because Plaintiff has failed to exhaust her administrative remedies with respect to that issue. For the reasons stated below, the court denies Plaintiff's motion.

## **FACTUAL BACKGROUND**

The ALJ's written decision does not identify the nature of the disability for which Plaintiff had been receiving benefits. The court understands, however, based on a pre-hearing letter Plaintiff's attorney sent to the ALJ, that Plaintiff stopped working at her job as a human resources manager on March 11, 2009 because of extreme and debilitating migraine headaches. (Certified Copy of the Admin. Record [8] (hereinafter "R.") at 325, 360.) At the time Plaintiff stopped working, her 27-year old son Jonathon was living in a group home that provided support services for adults with developmental disabilities. (*Id.* at 360, 384.) According to Plaintiff, in August of that year, her son had an epileptic seizure when he was left unattended in that group home, and he suffered a concussion and multiple injuries to his face after falling to the ground. (*Id.* at 384.) Plaintiff says that she decided at that point to remove him from the group home and care for him in her own home. (*Id.*) She also learned at that time that she was eligible for funding from the Illinois Adult Home Based Support ("AHBS") Program, which provides financial assistance to allow disabled individuals to receive care in their homes instead of in a group home. (*Id.* at 360, 384.) Plaintiff was Jonathon's primary caregiver at home until March 2012, when she returned to full-time work in human resources. (*Id.* at 251.)

By that time, therapy, relaxation, and other techniques had improved her condition, and she stopped receiving disability benefits. (*Id.* at 251, 326, 385.) Plaintiff continues to receive AHBS payments for Jonathon's care, but she now uses the funds to pay for a non-family caregiver. (*Id.* at 326.)

The SSA determined that Plaintiff was engaged in substantial gainful activity from September 2009 through March 2012 by caring for her son while receiving financial compensation through the AHBS program. (*Id.* at 20.) The Illinois AHBS Program is funded by Medicaid and is designed to assist with the cost of home or community-based services for individuals who would otherwise require care in a hospital, nursing facility, or intermediate care facility. (*Id.* at 331, 366.) The State of Illinois contracts with a private third-party service provider ("ACES$")[2] to administer the hiring and payment of personal support workers who care for disabled individuals in the AHBS Program. (*Id.* at 330.) To receive funding under the program, Plaintiff reported the amount of time she spent caring for Jonathon each month by submitting time sheets to ACES$, and ACES$ sent her a monthly check. (*Id.* at 386–87.) Regardless of the number of hours a caretaker works, there is a monthly limit on the amount of funding available for each individual enrolled in the program. (*Id.* at 21, 333.) At the hearing before the ALJ, Plaintiff testified that she worked more than 100 hours per month caring for her son and was paid an hourly rate of roughly $15 per hour up to the maximum amount, which she testified was around $1,900.[3] (*Id.* at 386–89.) The tasks Plaintiff performed on a weekly basis

---

[2] The ALJ and the parties refer to the third-party provider as "ACCESS." But Plaintiff's son's case manager, Tamara Watson, on whose letter the ALJ relied, refers to the company as "ACES$," (R. at 330), and the court's own research suggests that ACES$ Financial Management Services, part of the Northeast Pennsylvania Center for Independent Living, is the financial management services provider for the Illinois AHBS Program. *See* Center for Independent Living, https://mycil.org/Illinois/html (last visited September 27, 2017). For the remainder of the opinion, therefore, the court refers to the third-party provider as "ACES$."

[3] There is some ambiguity in the record with respect to the number of hours Plaintiff worked each month and the amount of compensation she received. As the ALJ noted, Plaintiff "testified that she received the maximum receivable monthly payment of $1,900, the amount of which remained unchanged from month to month." (R. at 20, 386–88.) Watson,

while caring for her son included helping him use the toilet, preparing his meals and snacks, helping him eat, administering his medications, setting up books and magazines for him to read and movies for him to watch, setting up the television, helping him bathe and dress, and driving him for doctor visits and for water therapy. (*Id.* at 21, 253.)

Plaintiff submitted time sheets documenting the hours she worked in order to receive payments from ACES$, but she nevertheless believes the payments do not constitute wages or income. Plaintiff contends that her position on the nature of the funds she received is consistent with a change in the tax status of the funds since the period when she was receiving disability benefits. According to an SSA investigator who looked into Plaintiff's case, until 2007, payments received under the AHBS program were considered reimbursements for the costs incurred in providing care, and were not taxed by the State. (*Id.* at 252, 362.) But when Illinois contracted with ACES$ to manage the payment of funds under the program as wages, the State began treating the payments as taxable income. (*Id.*) The treatment of these payment for federal tax purposes differs; the Internal Revenue Service determined that, as of January 3, 2014, "certain payments received by an individual care provider under a state Medicaid Home and Community-Based Services Waiver (Medicaid waiver) program . . . are difficulty of care

---

Plaintiff's son's case manager, reported a similar figure in a letter submitted to the ALJ, stating that "[t]he reimbursable funds are capped at a monthly maximum allowance of [$]1956.44." (*Id.* at 330.) When asked about the number of working hours she reported on her time sheets, Plaintiff explained that she reported "whatever that $15 an hour into the $1,900," which she said "comes out to, like 100 hours a month, something like that." (*Id.* at 388–89.) The ALJ understood Plaintiff to be testifying that "she was allowed to submit a maximum of 100 hours per month on her timesheet, although she worked more hours in caring for Jonathon." (*Id.* at 20.) Of course, if Plaintiff was paid roughly $15 per hour for 100 hours per month, her pay would only be $1,500.00 per month, not $1,900. Neither party has explained the discrepancy, and Plaintiff's paycheck stubs only compound the confusion. Those paycheck stubs reveal that Plaintiff was actually paid $1,717.50/month (before taxes) between September of 2009 and December 2011 for 114.5 hours of work per month, and $1,785.00 (before taxes) on January 2012 for 119 hours of work. (*Id.* at 62–89, 94–95.) It appears that Plaintiff submitted claims for more than 100 hours of work per month, but was nonetheless paid less than the monthly maximum allowance of $1,956.44. (*See id.* at 62–89.) In any event, it was reasonable for the ALJ to rely upon the testimony of Watson and Plaintiff herself to find that Plaintiff received at least $1,900 per month for more than 100 hours of work.

4

payments excludable under § 131 of the Internal Revenue Code." (*Id.* at 347.) Thus, the payments Plaintiff received under the AHBS Program were exempt from federal income tax. (*Id.* at 345.)

The SSA investigator who examined Plaintiff's case concluded that, although the Illinois tax status of the payments changed, the purpose of the AHBS Program remained the same: to reimburse the families for expenses incurred in taking care of disabled individuals at home. (*Id.* at 252, 362.) Plaintiff testified at her hearing that she understood the AHBS payments to be "a funding" or "a grant," as opposed to wages. (*Id.* at 397.) She emphasizes, also, that she used the funds to pay for expenses related to her son's disability, including modifications to her garage and bathroom, the purchase of a new "push chair" and a car that could transport the push chair, and payments for the portion of his medical care not covered by insurance. (*Id.*)

Plaintiff also maintains that even if the AHBS payments are considered compensation for the work of caring for Jonathon, she was not performing substantial gainful activity because she was significantly limited in her ability to care for him during the time period at issue. According to Plaintiff, she provided care for Jonathon on an "inconsistent basis." (*Id.* at 264.) She says there "might be some days when [she] could assist Jonathon [only] for part of the day," and there may have been days when she "laid [sic] in bed with a migraine." (*Id.*) Plaintiff emphasizes that other family members—including her other sons, and Jonathon's father, stepmother, grandmother, and aunt—helped to take care of Jonathon (*id.* at 251–253, 265, 327), and she disputes Watson's estimation (provided to the SSA investigator) that Plaintiff provided roughly 75 to 80% of Jonathon's care while other family members provided the rest. (*Id.* at 252–53.) According to Plaintiff, even if her other sons assisted Jonathon only 20 to 25% of the time, Jonathon was with his father more than 20% of the time (on weekends and holidays), and thus it was impossible for Plaintiff to have taken care of him 75 to 80% of the time, as Watson estimated. (*Id.* at 264.) At Plaintiff's attorney's request, Watson wrote a letter withdrawing her prior estimate of the percentage of time Plaintiff spent caring for Jonathon:

5

Watson noted that the earlier estimate was not based on "the hours reimbursed from timesheets [submitted to ACES$] during the timeframe in question." (*Id.* at 330.)

SSA denied Plaintiff's request for reconsideration of its overpayment determination in September 2012 but granted Plaintiff's request for a hearing before an ALJ. The ALJ conducted the hearing on February 26, 2013 and heard testimony from Plaintiff and two of her sons, Erich Missel and Thomas Gulo. During her testimony, Plaintiff emphasized that she believed the payments from ACES$ were "funding" rather than wages, that Jonathon's family members assisted Plaintiff in caring for him, and that she used the payments from ACES$ to cover expenses related to Jonathon's disability. (*Id.* at 394–98.) Plaintiff's sons testified about the amount of time they spent caring for Jonathon. Missel testified that Jonathon required care throughout the day and that someone was always home to care for him. (*Id.* at 404, 409.) He explained that Plaintiff had to be taken to the emergency room on a frequent basis because of her migraines and that either Missel or Gulo would watch Jonathon while she was away. (*Id.* at 405.) Missel said that he consistently helped with Jonathon's care before he moved out of the state in June 2010; he estimated that he provided about 40% of Jonathon's required care, while Plaintiff provided the other 60%. (*Id.* at 404, 406, 409.) Gulo testified that he helped care for Jonathon "all the time" when Jonathon first began living at home because Gulo was not employed at the time. (*Id.* at 412.) According to Gulo, once he started a new job in March 2010, he continued to help with Jonathon's care because he still lived at home and did not leave for work until the afternoon. (*Id.* at 412–13.) Gulo testified that he has since lost his job and is now helping to care for Jonathon "full-time." (*Id.* at 413.) Neither son was paid for the care they provided. (*Id.* at 408, 414.)

In a written decision issued on August 30, 2013, the ALJ concluded that Plaintiff had been overpaid disability benefits and was required to pay back the amount she had received. (*Id.* at 19.) The ALJ considered Plaintiff's argument that the payments she received were not income because she used them to pay for Jonathon's medical and other disability-related

6

expenses. But the ALJ disagreed, finding that the evidence showed that she was paid for her work activity. (*Id.* at 21.) The ALJ emphasized that since Plaintiff's return to work in human resources, she has used the same funds from the AHBS program to pay a third-party caregiver to perform the same tasks Plaintiff performed when she cared for Jonathon. (*Id.*) These payments to the third-party caregiver were, in the ALJ's view, evidence that Plaintiff's caretaking work had economic value, for which she was being compensated through the program. (*Id.*)

The ALJ also pointed to Watson's letter as evidence that Plaintiff had received income for work activities while she was caring for her son. As the ALJ noted, in that letter, Watson confirmed that Plaintiff was "employed" by ACES$, that the "reimbursement" ACES$ provided was for the care Plaintiff provided, and that Plaintiff "earned" the funds she received as a "personal support worker." (*Id.* at 21.) Watson's letter, the ALJ found, "clearly indicate[d] that the funds received by [Plaintiff] under the Home-Based Support Program[] represented payments in exchange for the home care services provided by the [Plaintiff] for her disabled son." (*Id.*) The ALJ rejected Plaintiff's argument that she worked under "special conditions" and therefore did not engage in substantial gainful activity because Jonathon's other family members assisted in caring for him. The ALJ noted that it was not necessary for Plaintiff to have provided *all* of Jonathan's care in order to have engaged in substantial gainful activity. (*Id.*) Plaintiff's reports of working over 100 hours per month and her receipt of over $9,000 per month satisfied the ALJ that she performed substantial gainful activity during the time period at issue. (*Id.*)

Following the ALJ's decision, Plaintiff filed a Request for Review of Hearing Decision/Order Decision on August 30, 2013. (*Id.* at 15.) The Appeals Council denied the request on May 6, 2015. (*Id.* at 5.) Plaintiff filed this suit in July 2015.

## **DISCUSSION**

I. **Standard of Review**

The Social Security Act authorizes judicial review of the Commissioner's final decision.

7

42 U.S.C. § 405(g). The ALJ's decision becomes the Commissioner's final decision once the Appeals Council denies a claimant's request for review. 20 C.F.R. § 404.981; *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000); *Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). A district court applies a deferential standard when reviewing the ALJ's decision, *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014), and must affirm if the decision is supported by "substantial evidence." 42 U.S.C. § 405(g); *Alvarado v. Colvin*, 836 F.3d 744, 747 (7th Cir. 2016). "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

The reviewing court must not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for the ALJ's." *Alvarado*, 836 F.3d at 747. The court should, however, "conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the [ALJ's] decision[.]" *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Even though the ALJ need not address every piece of evidence or testimony in the record, *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), she "must build a logical bridge from the evidence to [the] conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

**II.     Substantial Gainful Activity Legal Framework**

A claimant capable of engaging in substantial gainful activity cannot be found to be disabled and is not entitled to benefits. 20 C.F.R. § 404.1571. Work activity is substantial if it "involves doing significant physical or mental activities." *Id.* § 404.1572(a). Work activity is gainful if it is done for pay or profit, or is "the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.* § 404.1572(b). Non-work activity, such as "taking care of [oneself], household tasks, hobbies, therapy, school attendance, club activities, or social programs[,]" is not considered substantial gainful activity. *Id.* § 404.1572(c).

8

The primary consideration in determining whether work activity constitutes substantial gainful activity is the earnings derived from the work activity during the relevant period. *Id.* § 404.1574(a)(1). Where a claimant's average monthly earnings exceed a certain threshold, SSA presumes that the claimant has engaged in substantial gainful activity. *Id.*; *id.* § 404.1574(b)(2). SSA publishes an annual table of earnings thresholds. *See* Social Security Administration, *Substantial Gainful Activity*, https://www.ssa.gov/oact/cola/sga.html (last visited Dec. 5, 2017). When calculating a claimant's monthly income, SSA considers only the amount of income that is earned, and thus does not consider "any income that is not directly related to [the claimant's] productivity." 20 C.F.R. § 404.1574(a)(2). SSA will also subtract any "impairment-related work expenses" from the claimant's gross earnings. 20 C.F.R. § 404.1574(a)(2).

A claimant may rebut a presumption of substantial gainful activity arising from her income level by presenting "evidence of [her] inability to be self-employed or to perform the job well, without special assistance, or for only brief periods of time." *Jones v. Shalala*, 21 F.3d 191, 193 (7th Cir. 1994) (internal quotation marks omitted). In other words, if work is "done under special conditions that take into account [a claimant's] impairment," the SSA may find that the work does not constitute substantial gainful activity. 20 C.F.R. § 404.1573(c); *Jones*, 21 F.3d at 193. Examples of special conditions include, but are not limited to, situations in which a claimant: (1) requires and receives special assistance from other employees in performing her work; (2) works irregular hours or takes frequent rest periods; (3) is provided with special equipment or is assigned work specially suited to her impairment; (4) is "able to work only because of specially arranged circumstances, for example, other persons help[ ] [her] prepare for or get to and from [her] work"; (5) is permitted to work at a lower standard of productivity or efficiency than other employee"; or (6) is "given the opportunity to work despite [her] impairment because of a family relationship, past association with [her] employer, or [the] employer's concern" for the claimant's welfare. 20 C.F.R. § 404.1573(c)(1)–(6).

**III. Analysis**

    **A. Substantial Gainful Activity**

Plaintiff maintains that the ALJ's conclusion that Plaintiff performed substantial gainful activity, and thus received an overpayment, is not supported by substantial evidence. According to Plaintiff, the ALJ erred by concluding that Plaintiff's care for her son was gainful work activity. Gainful work activity, as Plaintiff points out, is work activity that one does "for pay or profit." 20 C.F.R. § 404.1572(b). Because Plaintiff spent the AHBS funds on medical expenses and other expenses related to her son's disability, she maintains that the work was not "done for pay or profit." But Plaintiff's argument appears to rest on a misreading of the applicable regulation, which states that "[w]ork activity is gainful if it is the kind of work *usually done for pay or profit, whether or not a profit is realized.*" *Id.* (emphasis added). As the ALJ noted in her decision, when Plaintiff returned to her human resources job, she used the AHBS funds to pay an outside caregiver to do the work Plaintiff had been doing. The fact that Plaintiff paid a third-party to do the same work is a significant indicator that the work is the kind usually done for pay or profit, and whether Plaintiff herself realized a profit from that work is beside the point. *Cf. Knight v. Astrue*, No. 10-C-592, 2011 WL 2292145, at *2 (E.D. Wis. June 7, 2011) (affirming ALJ's conclusion that mother caring for her disabled son and receiving benefits from the state to do so was engaging in substantial gainful activity).

Plaintiff also contends that the ALJ erred by (1) failing to consider impairment-related work expenses when calculating Plaintiff's earnings and (2) failing to address Plaintiff's contention that she was working under "special conditions." Plaintiff concedes that her monthly earnings of $1,900 exceed the substantial gainful activity earnings threshold, which was $980 for the year 2009. (Pl.'s Mem. in Supp. of Mot. for Summ. J. [20] at 8.) Though Plaintiff asserts that the ALJ failed to consider any subsidy Plaintiff received or impairment-related work expenses she had (*id.*), Plaintiff does not identify any specific subsidy or impairment-related work expenses the ALJ failed to consider. As discussed above, Plaintiff does identify expenses

10

related to Plaintiff's son, but she does not point to any "work expenses" resulting from her own purported impairment.

With respect to her argument that she worked under "special conditions," Plaintiff points to evidence that Jonathon's other family members assisted in caring for him, and that she worked irregular hours and took frequent rest periods because of her migraines. She argues that only a portion of the $1,900 she received every month was earned because other family members cared for Jonathon a large percentage of the time. But the ALJ addressed and rejected this argument in her decision and provided a reasonable basis for doing so. As the ALJ noted, Plaintiff herself submitted time sheets certifying that she spent more than 100 hours every month caring for Jonathon, and she was paid her monthly income on the basis of those 100 hours. (R. at 22.) The ALJ also pointed out that there was no requirement that Plaintiff provide *all* of Jonathon's care in order to receive the AHBS payments or to have engaged in substantial gainful activity. (*Id.*) Plaintiff has pointed to no evidence in the record suggesting that a home care provider who works over 100 hours per month would not be considered gainfully employed because she also took frequent rest periods or received assistance from family members. This does not appear to be a case in which a "boss feels desperately sorry for [an employee] and is retaining him on the payroll even though he is incapable of working" or where "a seriously disabled worker is able to work only by dint of his extraordinary determination and the extraordinary assistance extended to him by kindly fellow workers." *Jones*, 21 F.3d at 192. Rather, by her own account, Plaintiff worked more than 100 hours per month and received over $1,900 to do so, and "there is no evidence that [she] provided substandard of inadequate care for her son." *Knight*, 2011 WL 2292145, at *2. The ALJ's decision, therefore, is supported by substantial evidence.

**B.     The ALJ's Credibility Determinations**

In addition to her objection that the ALJ erred by finding that she engaged in substantial gainful activity, Plaintiff argues that the court should remand because the ALJ did not expressly

assess Plaintiff's credibility. (Pl.'s Mem. Supp. Mot. Summ. J. at 11.) Plaintiff cites a Social Security Ruling for the proposition that an ALJ must provide "specific reasons" for her findings of credibility. SSR 96-7P, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). That ruling, however, addresses an ALJ's obligations when evaluating allegations of pain and other medical symptoms and is therefore not obviously applicable in this case. Where an ALJ bases her decision on an adverse credibility determination, Plaintiff is correct that the ALJ should explain why she discounted the credibility of certain statements. *See, e.g.*, *Martinez v. Astrue*, 630 F.3d 693, 696–97 (7th Cir. 2011). But Plaintiff points to no adverse credibility determination that the ALJ failed to explain or justify. On the contrary, the ALJ largely credited Plaintiff's testimony and factual allegations but reached an unfavorable conclusion about how the Social Security guidelines applied in Plaintiff's case. Plaintiff points to the ALJ's characterization as "problematic" Plaintiff's assertions regarding the percentage of Jonathon's total care provided by each of his family members. But in finding her position "problematic," the ALJ did not dispute the credibility of Plaintiff or other witnesses. Rather, she determined that the percentage of care that each family member provided was irrelevant because Plaintiff had submitted time sheets saying she had worked 100 hours and had been compensated accordingly. The ALJ concluded that the work Plaintiff admitted to performing and the payments she received were sufficient to establish that she was engaging in substantial gainful activity, regardless of how much additional work other family members were doing to care for Jonathon. As discussed above, that determination finds support in the record and was a reasonable one. *See Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012) (reviewing court "merely examine[s] whether the ALJ's determination was reasoned and supported"). And because the determination did not rest on an assessment of Plaintiff's credibility, the ALJ was not required to provide any additional explanation for the conclusion she reached.

  C. **Waiver of Overpayment**

Plaintiff maintains that the ALJ erred by failing to address her request for waiver of

overpayment. The Social Security Act provides that there shall be no recovery of overpayment where the person who received the overpayment is "without fault" and if recovery "would defeat the purpose of [the Act] or would be against equity and good conscience." 42 U.S.C. § 404(b). In determining whether an individual is at fault for the overpayment, the SSA considers whether the overpayment resulted from:

> (a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or
>
> (b) Failure to furnish information which he knew or should have known to be material; or
>
> (c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

20 C.F.R. § 404.507. Plaintiff may indeed have a case for a waiver in this instance if, for example, the SSA were to credit her assertion that she did not believe, and had no reason to believe, that the payments she received from ACES$ constituted income income. And Plaintiff is correct that the ALJ did not consider her request for waiver.

The problem for Plaintiff in this case, however, is that the court lacks jurisdiction at this point to consider her waiver request. As the Appeals Council noted, a request for reconsideration of an overpayment determination and a request for waiver of overpayment are separate challenges to the SSA's action, and "waiver was not an issue before the ALJ in this case." (R. at 6.) Indeed, Plaintiff separately filed the two requests, and the SSA did not issue a ruling on Plaintiff's request for waiver of overpayment until February 9, 2016, while this case was pending. (Ex. A to Def.'s Resp. to Pl.'s Mot. for Summ. J. [28-1] at 2.) If Plaintiff wishes to challenge that ruling, "[r]econsideration is . . . the next step in the appeals process." 20 C.F.R. § 404.506(h). Because the Commissioner has not issued a final decision on the issue of waiver of overpayment, and Plaintiff has yet to exhaust her administrative remedies on the matter, this court lacks jurisdiction to consider the issue. *See* 42 U.S.C. § 405(g); *Sims*, 530 U.S. at 107.

## **CONCLUSION**

For the reasons stated above, the court denies Plaintiff's motion [19]. This case is dismissed without prejudice to further proceedings, if any, on Plaintiff's request for a waiver of overpayment.

ENTER:

Date: December 5, 2017

_____
REBECCA R. PALLMEYER
United States District Judge